[953 NYS2d 7]

WATHNE IMPORTS, LTD., Appellant, v PRL USA, INC., et al., Respondents.

First Department, October 18, 2012

84

**APPEARANCES OF COUNSEL**

*Manatt Phelps & Phillips LLP*, New York City (*Thomas C. Morrison* and *Jeremy R. Lacks* of counsel), and *Phillips Nizer*

*LLP*, New York City (*Bruce J. Turkle, Stuart A. Summit* and *Chryssa V. Valletta* of counsel), for appellant.

*Kelley Drye & Warren LLP*, New York City (*John M. Callagy, Robert I. Steiner* and *Damon W. Suden* of counsel), for respondents.

## OPINION OF THE COURT

SAXE, J.

Plaintiff Wathne Imports, Ltd. is a privately held family business that has been a licensee of defendants PRL USA Inc., the Polo/Ralph Lauren Company L.P. and Polo Ralph Lauren Corporation (collectively, Polo) since 1984, manufacturing and selling products bearing Polo/Ralph Lauren brand trademarks, doing business under the name "Polo Ralph Lauren Handbag and Luggage Company." On November 23, 1999, Wathne and Polo entered into an amended license agreement under which Polo granted Wathne the exclusive license through December 31, 2007 to manufacture and sell handbags in the United States and Canada bearing the marks "Polo by Ralph Lauren," "Ralph (Polo Player Design) Lauren," "Ralph Lauren" (including "Collection" and "Blue Label"), "Polo Sport," "Lauren/Ralph Lauren" and "Polo Jeans Co." If Polo discontinued one of those trademarks, the agreement required it to provide Wathne with a replacement mark of "substantially equivalent market value." The amended license agreement also gave Wathne a non-exclusive right to sell the merchandise outside the U.S. and Canada with Polo's consent, which right Polo could terminate upon 180 days' written notice.

Wathne alleges that Polo breached the license agreement by, inter alia, discontinuing the use of the "Polo Sport" mark in 2001 without replacing it with a substantially equivalent mark.

In their in limine motion, defendants asked the trial court to preclude plaintiff's use of its expert at trial and to exclude any testimony and evidence regarding alleged lost profits from international sales. The court granted defendant's motion by precluding plaintiff from establishing its lost profits through the testimony and reports prepared by plaintiff's damages expert, to the extent the expert used Coach, Inc., as a comparable in calculating the growth rate that Wathne could have achieved in its handbag sales. The court also precluded plaintiff from relying on international sales in calculating its lost profits claim.

Plaintiff's designated damages expert was Glenn Newman, an experienced CPA who was a partner at ParenteBeard LLC and

was accredited by the American Institute of Certified Public Accountants in certified financial forensics. At his deposition and in his expert report, Newman analyzed, inter alia, Wathne's damages arising from the discontinuance of the Polo Sport mark. To do so, he determined the average of the actual gross sales from Polo Sport handbags during the period 1998 to 2000, and then compared the available data from other companies selling handbags—specifically, Coach and Tod's s.p.a.—as benchmarks for determining the growth rate in the handbag industry since then. Newman explained that he used Coach's and Tod's figures because no other companies publicly reported handbag sales. Newman concluded that sales of Polo Sport-branded handbags would have grown throughout the license period, noting that it was a period when people were buying more handbags, as shown by Coach's handbag sales, which had grown at a rate of 30% a year, a figure he verified by cross-checking against Tod's handbag sales during that period. Newman extrapolated that, had Polo not discontinued the Polo Sport brand in 2001, Wathne's revenues between 2001 and 2007 would have grown at a compounded annual growth rate of 25%, and using that growth rate, Newman projected that Polo Sport sales should have been $341.3 million between July 1, 2001 and December 31, 2007. He then calculated lost profits on Polo Sport sales of $82.6 million.

Although Newman stated in his expert report that Wathne and Coach had comparable distribution channels, he acknowledged during his deposition that Coach operated out of its own 259 retail stores, while Wathne sold to outlet stores and department stores and did not operate any retail stores of its own. He also acknowledged the sales projections Wathne made in February 1998 and April 2000, in which it stated that "the business continue[d] to decline in Polo Sport" during the preceding periods; according to Newman, market segmentation had affected Wathne's sales results. Newman explained that he took these factors into account in forming his damages assessment.

In their in limine motion, defendants' expert asserted that Newman's damages estimate was grossly overstated, in view of Wathne's actual profits in the previous years, and suggested that the assumptions upon which Newman based his calculation were "aggressive and speculative." Defendants also retained an industry expert, Victor Lipko, who challenged Newman's premise by asserting that Coach's and Tod's handbags were not competitive with plaintiff's; however, Lipko acknowledged that

he did not know of any publicly available information about products that were competitive with Polo Sport, explaining that he "was not asked to" look for that information.

The trial court held that, as a matter of law, it was incorrect for plaintiff's expert to use Coach, Inc. as a comparable in order to determine the prospective growth rate for sales of Polo Sport handbags, because the two brands were too dissimilar. The court remarked that sales by a Polo licensee could not be compared with sales by a "standalone" company such as Coach that sold its own product line. It then proposed an analysis of its own devising, not proposed by any expert: that plaintiff's expert should compare Polo Sport handbag sales with Polo's sales of its products bearing other trademarks over the same period. Although defendants' damages expert had admitted that there was no other publicly available data on handbag sales during the relevant period, and defendants' industry expert had offered no alternative approach to establishing the industry growth rate during the period in question, the trial court stated that sales of Polo-branded products generally was the appropriate mechanism by which plaintiff's expert should calculate plaintiff's growth projections and ultimately its lost profits.

■ We reverse. The perceived flaws in plaintiff's expert's analysis are relevant to the weight a jury should give to the expert's report and testimony; they do not present sufficient grounds for ruling that analysis inadmissible. Newman's analysis and conclusions should be challenged through cross-examination; the jury must decide whether or not his methodology was appropriate. As the United States Supreme Court said in *Daubert v Merrell Dow Pharmaceuticals, Inc.* (509 US 579, 596 [1993]), "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

It is true that a party may only recover damages for loss of future profits if it "demonstrate[s] with certainty that such damages have been caused by the breach . . . , the alleged loss must be capable of proof with reasonable certainty . . . not . . . merely speculative, possible or imaginary . . . [and] the particular damages [must have been] fairly within the contemplation of the parties" (*Kenford Co. v County of Erie,* 67 NY2d 257, 261 [1986]). Of course, "New York law does not countenance damage awards based on [s]peculation or conjecture" (*Wolff & Munier, Inc. v Whiting-Turner Contr. Co.,* 946 F2d 1003, 1010 [2d Cir 1991] [internal quotation marks omitted]).

The Court in *Ashland Mgt. v Janien* (82 NY2d 395, 405-406 [1993]) explained that the evidence in *Kenford Co. v County of Erie* was insufficient to satisfy the applicable standard because the claim of lost profits for managing a stadium required the court to accept too many speculative assumptions, namely, that "the stadium had been completed, opened and operated successfully for 20 years, [and] that it also attracted professional sporting events, concerts and conventions fully supported by the public." In contrast, the evidence in *Ashland* was sufficient because it "rest[ed] on the parties' carefully studied professional judgments of what they believed were realistic estimates of future assets to be managed by the use of [a particular growth model]" (82 NY2d at 406).

While both *Ashland* and *Kenford* were determinations made after trial, claims for lost profits have been dismissed by this Court upon a motion for summary judgment where the plaintiff's lost profits were said to arise from a "new business endeavor" with no track record (*see Zink v Mark Goodson Prods.*, 261 AD2d 105, 106 [1st Dept 1999], *lv dismissed* 94 NY2d 858 [1999]), or a business in the "development stage" that "had never generated any revenue" (*see Digital Broadcast Corp. v Ladenburg, Thalmann & Co., Inc.*, 63 AD3d 647, 647-648 [1st Dept 2009], *lv dismissed* 14 NY3d 737 [2010]).

A number of federal cases have explained that where lost profits are at issue, " 'an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding' a party's future prospects" (*see Supply & Bldg. Co. v Estee Lauder Intl., Inc.*, 2001 WL 1602976, *4, 2001 US Dist LEXIS 20737, *13 [SD NY, Dec. 14, 2001, No. 95 Civ. 8136 (RCC)]). In *Supply & Bldg. Co.*, the court precluded the plaintiff's expert's evidence regarding its claim of lost profits because the expert based his projections on a summary of orders prepared by the company's general manager, rather than on the orders themselves, assumed certain sales values based on the assurances of the plaintiff's principal rather than review of its records, and assumed that the plaintiff's operations had successfully started up on a particular date, based on plaintiff's representations, rather than accessible evidence to the contrary. The expert's report in *Compania Embotelladora Del Pacifico, S.A. v Pepsi Cola Co.* (650 F Supp 2d 314, 321 [SD NY 2009]), was precluded because the court found it to be "built upon one baseless, flawed assumption after another."

However, a degree of uncertainty is to be expected in assessing lost profits (*Duane Jones Co. v Burke*, 306 NY 172, 192

[1954]). "[W]hen the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will not be denied recovery of substantial damages," although, of course, the plaintiff must show "a stable foundation for a reasonable estimate" of damages (*ESPN, Inc. v Office of Commr. of Baseball*, 76 F Supp 2d 416, 418 [SD NY 1999] [internal quotation marks omitted]; *Freund v Washington Sq. Press*, 34 NY2d 379, 383 [1974]). An estimate of lost profits incurred through a breach of contract "necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection" (*Tractebel Energy Mktg., Inc. v AEP Power Mktg., Inc.*, 487 F3d 89, 111 [2d Cir 2007] [internal quotation marks omitted]). "[I]t is always the breaching party . . . who must shoulder the burden of the uncertainty regarding the amount of damages" (*Boyce v Soundview Tech. Group, Inc.*, 464 F3d 376, 392 [2d Cir 2006]).

Newman's use of sales of Coach handbags in his methodology was not without foundation; therefore, his analysis should not have been dismissed as a matter of law. Contrary to the trial court's conclusion, we view the rate of growth experienced in the fashion handbag market during the period in question as related to a calculation of plaintiff's lost profits. Newman's effort to anticipate the expected growth rate in sales of Polo Sport handbags may have contained an element of "improvisation." However, Newman did not equate the Polo Sport's with Coach's success or profit levels; he merely used Coach's handbag sales as a tool to evaluate how well that broad category of product sold during the relevant period. The validity of this approach may be challenged at trial, but by holding that it was incorrect as a matter of law, the trial court unduly interfered with the approximation that was required due to the lack of more exact comparables.

It was also error for the trial court to insist that plaintiff's expert recalculate plaintiff's lost profits, replacing the Coach handbag figures with the figures for sales of Polo's other products. There was no indication by any expert that those figures were more valid or more likely to produce an accurate result than the figures used by plaintiff's expert.

Furthermore, neither plaintiff's actual sales figures prior to the alleged breach nor plaintiff's modest sales projections made in 1998 and 2000 disprove or invalidate the growth rate that, according to Newman, had developed since that time, as determined based on other companies' handbag sales.

■ Finally, plaintiff's expert should also be permitted to testify regarding international sales for purposes of the calculation of damages. Although plaintiff's right to conduct international sales required Polo's consent and could be terminated, the record provides a proper basis for inclusion of this category of sales in the estimate of lost profits as well, since plaintiff had, in fact, sold the trademarked handbags on the international market (see *Kenford Co. v County of Erie*, 67 NY2d 257, 261 [1986]).

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered March 6, 2012, which, insofar as appealed from, granted defendants' motion in limine to preclude plaintiff's expert from testifying as to a particular measure of damages for lost profits for sales of handbags bearing the "Polo Sport" trademark, should be reversed, on the law, without costs, and the motion denied. The appeal from so much of the order of the same court and Justice, entered February 29, 2012, which granted, in effect, the same relief, should be dismissed, without costs, as superseded by the appeal from the aforementioned order.

MAZZARELLI, J.P., DEGRASSE, RICHTER and ABDUS-SALAAM, JJ., concur.

Order, Supreme Court, New York County, entered March 6, 2012, reversed, on the law, without costs, and the motion denied. Appeal from order, same court, entered February 29, 2012, dismissed, without costs, as superseded by the appeal from the aforementioned order.